THE STATE COUNCIL OF THE JUNIOR ORDER OF UNITED AMERI-CAN MECHANICS OF THE STATE OF NEW JERSEY, respondent,

*v.*

ENTERPRISE COUNCIL, No. 6, appellant.

[Argued November 19th, 1908. Decided March 1st, 1909.]

A beneficiary order was organized into national council, state councils and subordinate councils. By the scheme of the order the funds contributed by the individual members were paid to the subordinate councils, and a small sum for expenses only paid each year to the state council, part of which was for the expenses of the national council. The constitution, by-laws and permission to organize the subordinate council contained provisions that upon dissolution of the subordinate council its property should be forfeited. After a severance of relations between the national council and the state council, one of the subordinate councils remained true to its allegiance to the national council, retained its organization, and continued its operations as before.—*Held*, that under the circumstances the state council could not, by its own act, work a forfeiture of the property of the subordinate council.

---

On appeal from a decree of the court of chancery advised by Advisory Master Pitney.

The bill was filed for a discovery and account of the assets in the hands of the defendant and a decree that the complainant was the owner of the same and requiring the defendant to deliver all of its property to the complainant. The history of the organization is set forth in the opinion of Vice-Chancellor

Pitney in *State Council* v. *National Council, 71 N. J. Eq. (1 Buch.) 433* (at *p. 437*). The defendant is one of two local councils, which adhered to the national council at the time of the severance of relations between the national council and the state council. It was originally organized pursuant to leave of the Pennsylvania state council, on October 9th, 1868, prior to the organization of the state council of New Jersey and of the national council. The written authority to organize is called a charter, but is in effect merely a permission to certain gentlemen to form a subordinate council. This permission provided that if Enterprise council was dissolved by forfeiture of its charter or otherwise, then all books, papers, &c., the property of said council, should become the property of the state council of Pennsylvania. The "laws" of the national council provide as follows:

"In the event of the disbanding of a council the national or state council (granting its charter) shall collect its charter, private work, books and other property previous to granting a charter for its reorganization."

By the "laws" of the state council (edition of 1873) provision was made for a revenue to be derived from the sale of certain printed matter and from the payment of not less than three nor more than five per cent. on all amounts received for propositions, initiations, admissions by card, degrees and weekly dues, as the state council might from time to time direct; and it was provided that any council neglecting or refusing to pay the same should be deprived of the privileges of the order and be debarred of the right to be heard through their representatives on the floor of the state council. The "laws" of the state council (edition of 1900) contain the following provision:

"A council may be suspended or dissolved, and its charter and property forfeited to the State Council, for improper conduct, or for a refusal to enforce or obey the laws adopted by this State Council, for refusing or neglecting to make proper returns in due time, or for non-payment of its per capita tax, for not holding a regular meeting for a period of three months, or being reduced in membership to less than seven; but a charter of a council shall not in any case be forfeited until it shall have been duly notified and opportunity offered to answer the charges preferred against it."

The printed record fails to show whether this provision was contained in the laws of the order in force prior to 1900, as nothing is printed but extracts from those laws. By the constitution of the national council an appeal was given to the national council from the action of a state or subordinate council.

*Mr. Alan H. Strong* (with whom was *Mr. Fergus A. Dennis*), for the respondent.

*Mr. Barton B. Hutchinson* and *Mr. Robert H. McCarter*, for the appellant.

The opinion of the court was delivered by

SWAYZE, J.

In the opinion of the court of chancery in the first case which arose in this state growing out of the controversy between the national council and the state council, it was held that the relation between the parties was a purely voluntary one; that any member might withdraw at any time. Since neither the national council nor the state council had any individual members, but were composed of delegates, it necessarily followed that the subordinate councils might continue their life and existence without reference to or assistance from either state or national council, and that they and their individual members comprised and formed the very life and soul of the whole order, as was subsequently stated by the same vice-chancellor, in the opinion in *State Council v. National Council, '71 N. J. Eq. (1 Buch.) 433.* In that opinion he contrasted the legal relation between the national, state and subordinate councils with the legal relation between the national government and the governments of the several states. The decree in the first case was affirmed upon the vice-chancellor's opinion, and the appeal from the decree in the second case was dismissed. It is thus settled that it is the subordinate councils which have an independent existence, and that their relationship with the state and national councils is, as the vice-chancellor said, a purely voluntary one. The state council

could have no greater right to coerce the subordinate council than the national council had to coerce the state council.

The fact that the national and state councils chose to call their permission to organize subordinate councils a "charter" and chose to call their constitution and by-laws "general laws," does not give them the force of law. As the vice-chancellor held in the opinion approved by this court, the relationship is purely contractual, and in ascertaining the terms of that contract, recourse must be had to the so-called "charter" and "laws," which embodied the terms upon which individual members became associated in these organizations. Those documents have a twofold aspect. In the first place, they determine the relationship between the three grades of councils and the method of securing co-operation and enforcing discipline, and in the second place, they contain provisions affecting the property rights of the individual members of the order in the funds arising out of their contributions. In the present case, we are concerned only with the property rights.

In determining these rights it is of the first importance to consider the object with which the funds are raised and the method of disposition in contemplation of the individual members of the order. Enterprise council is a New Jersey corporation organized for benevolent and charitable purposes. Its specific objects are set forth in what is called its constitution, which are to maintain and promote the interests of the American youth and shield them from the depressing effects of foreign competition; to assist Americans in obtaining employment; to encourage Americans in business; to establish a sick and funeral fund; to prepare the youth of America to become members of the order of United American Mechanics when they arrive at the proper age. It seems probable that the only object for which funds would be likely to be accumulated is the establishment of a sick and funeral fund. No provision is made in the constitution and by-laws either of the national or state council for turning over any of this fund to either of those organizations. The right of the state and national councils to revenue is limited to what is called a tax, and is really a contribution of a small sum *per capita* for the necessary expenses of those councils collected

of the individual members by the subordinate councils. Such revenue as the state council derived from the sale of printed blanks was nothing more than a profit upon the sale of merchandise, which the subordinate councils might buy elsewhere if they chose. The form of traveling card issued by the subordinate councils indicates that the amount of sick and funeral benefits to be allowed to a member, was fixed and determined by the constitution and by-laws of the local council, and there is nothing to indicate that there was any legal claim on the part of a member to relief from a council other than that to which he belonged, or that there was any legal obligation on the part of either national or state councils to pay such benefits. The claim of the individual member to relief, and the obligation to afford it, rested upon the subordinate council only. Enterprise council has paid the capitation tax collected by it from its members on behalf of the state council up to the time of the severance of relations, and the only question is whether, since that severance, the state council is entitled to the funds accumulated by Enterprise council for the purposes of the order. Those purposes, as far as concerns the accumulated funds, were the relief of the members of Enterprise council alone, and if that council is to be deprived of those funds, it must be by reason of something in the contract which justifies the conclusion that the members who contributed the funds did so with the understanding that in certain contingencies the money should be turned over to purposes other than that for which it was raised, the relief of members of Enterprise council. As was held in *National Council* v. *State Council, 64 N. J. Eq. (19 Dick.) 470,* the burden of proof was upon the complainant to establish the trust, and that trust must be the trust created by the individual members who contributed to the fund. It is quite evident that these contributors did not intend to create any trust in favor of either the state or national council as long as the relations between the subordinate council and the state council and between the state council and national council remained unsevered. The only provisions that seem to contemplate any change of the trust when the relations were severed is that contained in the so-called charter of Enterprise council and the extracts from the laws above quoted.

The provision in the charter was that upon the dissolution of Enterprise council the books, papers, &c., the property of the council, should become the property of the state council of Pennsylvania. If we assume, as perhaps we fairly may, that upon the organization of the state council of New Jersey and the affiliation of Enterprise council therewith, the state council of New Jersey took the place of the state council of Pennsylvania, the question still recurs whether the condition upon which the property was to be forfeited has been complied with and whether the accumulated funds are a part of the property that was to be forfeited.

It is convenient to deal with the latter question first. The provision relates to "all books, papers, &c., the property of the said council." It would seem that this language was hardly intended to cover accumulated funds. If it had been in contemplation in 1868 that such funds would be accumulated, it is difficult to explain the omission of any reference thereto, and the charter is careful not to say that all the property of Enterprise council shall become the property of the state council, but to limit it to the "books, papers," &c., which are the property of Enterprise council. It probably was not contemplated at the time that funds would be accumulated, and it was no doubt thought that all that would be necessary upon the dissolution of Enterprise council would be to take up the books and papers, including, perhaps, the regalia and similar property. But even if the language is sufficient to include invested funds, it becomes necessary to determine whether the condition upon which the property was to pass to the state council has been fulfilled. This condition was not that the so-called charter should be forfeited, but that the council should be dissolved, and the law which we have quoted provided that a council might be suspended or dissolved and its charter and property forfeited to the state council. In view of the use of language such as "charter," "laws," "tax" and "dissolution," which appears throughout the documents, it seems probable that the authors had the idea that the order possessed the power to grant charters, enact laws, levy taxes and dissolve subordinate councils; in short, that it possessed, so far as the order was concerned, governmental powers. If this is so,

the word "dissolution" should be construed as meaning what it would mean when we speak of a corporation being dissolved by an act of government or judicial proceedings, and this is the construction that we think ought to be adopted in view of the legal principle that conditions involving a forfeiture of property are to be construed strictly. If this is the proper construction, the condition upon which the property was to be forfeited has not come to pass, for, in fact, Enterprise council has not been dissolved; it is still an existing body; all that has happened has been that it has thrown off allegiance to the state council and adhered to the national council, just as the state council itself threw off its allegiance to the national council. Moreover, the state council is without power to dissolve Enterprise council, for that is a corporation under the laws of the State of New Jersey, and can only be dissolved by proceedings in accordance with the New Jersey statutes. The fact is that the word "dissolution" is inapt to express any legal intent which the parties may have entertained, for, even in the case of an unincorporated association, it would be quite impossible for the state council to dissolve such a voluntary association as long as its members chose to continue together. If, however, we should assume, in order to give a force to the language which the parties probably did not themselves have in mind, that by dissolution they meant only the dissolution of the relations existing between the state council and the subordinate councils, the question would still remain how that termination should be brought about so as to work a forfeiture of property. The complainants must establish that they themselves had the right to dissolve this connection, and thereby possess themselves of the property of Enterprise council held in trust by that council for the purposes of its organization and subsequent incorporation, and for the benefit of its individual members. It was upon that view that the vice-chancellor determined this cause. Such a provision for the forfeiture of property or, what amounts to the same thing, a change in the personnel of the *cestuis que trust,* would be contrary to the fundamental principle which prevents one from being a judge in his own cause, and, as far as Enterprise council is concerned, it would be illegal also because it would

strip that council of the property which it held for the purpose of carrying out the object for which it was incorporated.

We approve of the rule established in *Austin* v. *Searing, 16 N. Y. 112.* The court there said: "The effect of some of the provisions of these constitutions is to create a tribunal having power to adjudicate upon the rights of property of all the members of the subordinate lodges, and to transfer that property to others; the members of this tribunal being liable to constant fluctuations, and not subject in any case to the selection or control of the parties upon whose rights they sit in judgment. To create a judicial tribunal is one of the functions of the sovereign power, and although parties may always make such tribunals for themselves, in any specific case, by a submission to arbitration, yet the power is guarded by the most cautious rules. A contract that the parties will submit confers no power upon the arbitrator, and even where there is an actual submission it may be revoked at any time. The law allows the party, up to the last moment, to ascertain whether there is not some covert bias or prejudice on the part of the arbitrator chosen. It would hardly accord with this scrupulous care to secure fairness, in such cases, that parties should be held legally bound by the sort of engagement that exists here, by which the most extensive judicial powers are conferred upon bodies of men whose individual members are subject to continual fluctuation."

In the later case of *Wicks* v. *Monihan, 130 N. Y. 232; 29 N. E. Rep. 139,* the court said: "The property of local assembly No. 4119 was not derived from the general assembly, but was contributed and owned by the associated members of No. 4119, and held by an absolute title as perfect and unconditional, so far as is shown by the case, as is the title by which any person or corporation holds its individual property. To hold that the general assembly can, by a decree, divest the title to property and vest it in itself, is giving to it a power which is forbidden to be exercised by congress or by the legislature of any state."

A similar result was reached in *Wells* v. *Monihan, 129 N. Y. 161; 29 N. E. Rep. 232.* The court said, referring to Excelsior Assembly 4120 of the Knights of Labor: "Their charter was revoked for insubordination, of which, very likely, they were

guilty. The offence and its punishment ended their powers and privileges so far, and so far only, as they were derived from the rules and regulations of the Knights of Labor, but could not destroy their rights as individuals, or as an unincorporated association derived from the law of the state. Under that law they could, as they did, associate for a common purpose, and choose officers, in whose names they could sue. These powers·they had when their charter from the knights was given, and retained when it was taken away. That event broke off their relations with the order, but not with their own treasury. That treasury they could control, in their collective capacity, until some superior power took it away, or it disappeared in a final distribution among the members."

The same result was reached in a like litigation in Maryland (*District Grand Lodge* v. *Jedidjah Lodge, 65 Md. 253; 3 Atl. Rep. 104,* and in a later phase, *67 Md. 117; 9 Atl. Rep. 13*), where the court said: "It is true that when this corporation was formed, this lodge was a subordinate lodge, forming part of the general order, and by several of the articles of association it was bound to observe and enforce the rules and regulations of the grand lodge of the district. But the courts must look to the powers, which the state has, by its laws, conferred upon this corporate body. Among them, as we have said, is the power to change its articles of association, given not only by the original act of 1852, but secured by the present corporation laws. Such a change of its articles as would completely sever all connection between this corporation and the district grand lodge or the general order could be made without, so far as we can perceive, affecting injuriously any substantial property or pecuniary rights of any of the corporators or members; and it is such rights only that the courts can consider. But, even if such change could not be made without inflicting such injury, and if the corporation has wrongfully refused to obey the order of the grand lodge, still this would only be cause for the annulment of its charter by the legislature, or for proceedings against it as provided by the corporation laws. A corporation can only be dissolved, but the mode for doing that is likewise provided by law."

The court added: "Whatever powers the higher lodges in such

an organization as this may have to make rules or laws for the government of the subordinate lodges and the discipline of their members, we think it quite certain that the courts can never recognize as valid any rule or law so made, the effect of which is to confiscate property, or to arbitrarily take away property rights from one set of members, and give them to another set; nor will the courts allow or recognize the enforcement of any such rule when its enforcement will accomplish, and is designed to accomplish, such a result."

There is another objection to the procedure by which the state council attempted to forfeit the rights of Enterprise council. By virtue of the constitution and by-laws of the order, an appeal was allowed from the action of the state council to the national council, so that the contract between the parties did not permit a forfeiture by the action of the state council alone. It is no answer to say that the appeal from the state council to the national council had become impossible by reason of the severance of their relations, for the right of forfeiture was a contractual right, and the terms of the contract must be strictly complied with to work the forfeiture. If such compliance became impossible by reason of the act of the state council in severing its relations with the national council, whether that act was rightful or wrongful, it did not thereupon become possible for the state council to alter, to its own advantage, the contract with Enterprise council and with the individual members.

The attempt to forfeit the charter of Enterprise council seems to have been made upon notice, as required by the then existing constitution and by-laws of the state council, adopted in 1900. But the effect of the forfeiture, if it has the force attributed to it by complainant, is to take away not only the rights of Enterprise council growing out of its connection with the state council, but to destroy the interest of the individual members of Enterprise council in funds contributed by themselves or their predecessors and associates. Before they could be deprived of this property right they were themselves entitled to be brought into the proceeding. So far as appears, the only effort that was made to give notice was a service upon the recording secretary of Enterprise council.

It can hardly be urged that, although the attempt by the state council to forfeit the property of Enterprise council was insufficient to accomplish that purpose, the court ought now to forfeit the charter. A court of equity is not the tribunal in which corporations are to be dissolved for such reasons; nor does a court of equity lend its aid to enforce the forfeiture of property rights. Moreover, no cause for forfeiture appears. Enterprise council, so far as the case shows, is still performing the functions for which it was organized, and carrying out the purposes for which it was incorporated, and administering the funds contributed by its members in accordance with their wishes and for the purposes for which they were contributed. As Vice-Chancellor Pitney said, with the approval of this court, in *National Council* v. *State Council, 64 N. J. Eq.* (*19 Dick.*) *470* (at *p. 473*), the relation between the parties is a purely voluntary one, and any member may withdraw at any time. "The adhesive power which holds these several bodies together is the supposed benefit, first, to the individual members by reason of their membership; then to the subordinate council by reason of its connection with the state council, and then to the state council by reason of the benefit supposed to be derived by its connection with the national council." In that case he held that the national council could not recover from the state council moneys which had been collected by the state council of the individual members, for the reason that, under the circumstances of that case, they had not been contributed by the individual members for the use of the national council. The case is entirely analogous to the present, where the funds were contributed by the members for the relief of themselves and their associates, and not for the purpose of being turned over to another organization for the benefit of other persons when neither that organization nor those persons were under any obligation to hold the funds for the purpose for which they had been contributed. The case differs very materially from *State Council* v. *Sharp, 38 N. J. Eq.* (*11 Stew.*) *24,* where the complainant's constitution provided that the amount received by the state council upon dissolution of the subordinate council should be appropriated for the assistance and support of the widows and orphans of members of the subordinate

council, and that if there were no such widows and orphans, the amount should be invested and paid in case of reorganization to the subordinate council.   In that case the subordinate council disbanded and undertook to divide up its funds, contrary to the scheme under which they had been raised, and the state council was seeking to enforce the trust created by the contributors to the fund, not as in the present case to work a forfeiture of the rights of the *cestuis que trust.*   It differs also from the case of *Knights of Pythias* v. *Germania Lodge, 56 N. J. Eq. (11 Dick.) 63*, where the statute of the order provided that the receipts of a subordinate lodge should constitute a trust fund for carrying out the fraternal and beneficial features of the order, and that the fund should not be subject to partition among the members of the lodge, but should revert, in case the lodge ceased to exist, to the grand lodge.   In that case, also, the subordinate lodge disbanded and undertook to turn its funds to a channel other than that contemplated by the statutes of the order.   So, also, in the case of *Schubert Lodge* v. *Schubert Verein, 56 N. J. Eq. (11 Dick.) 78*.   So far as the case of *Allmann* v. *Benz, 27 N. J. Eq. (12 C. E. Gr.) 331*, is applicable, it favors the position of the defendant, for it was there held that those who remained true to their allegiance to the grand lodge of the United States, and the grand lodge of this state, were entitled to the property of the society.   The defendants have remained true to the national council.   The distinction between funds in which, by virtue of the terms under which they were contributed, the superior council or lodge has an interest, and those which are under the control of the subordinate lodge is pointed out by Vice-Chancellor Green in *Lady · Lincoln Lodge* v. *Faist, 52 N. J. Eq. (7 Dick.) 510*.

We have not found it necessary to determine the question whether the advisory master who heard this cause was at the time authorized to hear it.   If he was not, the appellants were quite within their rights in not arguing the case before him; if he was, the appellants should not, by reason of that default, be deprived of their right of appeal, for the reason that the respondent submitted to answer the petition of appeal, and has thereby submitted the case to the decision of this court, and should be

held to' have waived its right, if it had such, to dismiss the appeal.

For the reasons stated we think the property in question was the property of Enterprise council, and the decree adjudging that it belonged to the state council must be reversed, with costs.

*For affirmance*—None.

*For reversal*—The Chancellor, Chief-Justice, Garrison, Swayze, Reed, Trenchard, Parker, Bergen, Voorhees, Minturn, Bogert, Vredenburgh, Vroom, Gray, Dill—15.