[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 512 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 513 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 514 
This is an action filed by the individual plaintiffs as members of Industrial Union of Marine and Shipbuilding Workers of America, Local #1, hereafter referred to as the "Local," for and on their own behalf and allegedly on behalf of all other members of said union. The matter is as well entitled in the name of Industrial Union of Marine and Shipbuilding Workers of America, Local #1, and unincorporated association, as plaintiffs, and seeks to enjoin the individually named defendants, who were officers and trustees of said Local on September 28, 1948, from representing themselves as members or officers of said union and from exercising any of the powers as said alleged officers. Plaintiffs seek also to restrain the individual defendants from acting as officers or stockholders of the Shipbuilders' Educational Society and the Lester Investment Company, both being corporations admittedly holding title to real estate or personalty in trust for the said Local, and to restrain the New York Shipbuilding Corporation and the other named financial institutions from paying over to the individually named defendants who claim to be the officers and trustees of the said Local, and the officers of the Shipbuilders' Educational Society and the Lester Investment Company any funds in their possession.
Briefly stated, the object of the litigation is an attempted ascertainment of whether the plaintiffs or the defendants and the members of the Local whom they are alleged to represent are properly to be considered the Local.
On the original application the court granted a temporary restraining order and an order to show cause why an interlocutory injunction should not issue. This is the return day of *Page 516 
the order to show cause whether the interlocutory injunction should so issue.
For the purpose of convenience, the Industrial Union of Marine and Shipbuilding Workers of America will be designated as the National.
From the affidavits, the following set of facts were developed: In October 1933 the Local, an unincorporated association, was organized to represent the workers in the yard of the New York Shipbuilding Corporation in Camden, New Jersey. Thereafter, and allegedly through the efforts of said Local, the National was organized in September 1934. On January 14, 1934 the Local adopted its original by-laws, which were subsequently amended. On September 30, 1934 the National adopted by-laws, which were as well subsequently amended. The Local became affiliated with the National subsequent to its organization. For some years the relationship seemed to have been amicable but in recent years a portion of the membership of the Local became dissatisfied with the conduct of the National in two particular and especial respects: (1) The constitution of the National provided, as one of its cardinal principles, that it opposed craft unionship and was in favor of "one industry, one union," and that its jurisdiction should extend to "all workers employed in ship building, ship repairing, marine maintenance industry and industries producing marine equipment and allied enterprises." It as well provided that after September 26, 1942 no employee of any other industry should be admitted to membership unless the application were approved by the general executive board of the National. The dissentient members of the Local contend that these basic principles were flagrantly violated by admitting to membership in the National, organizations of turnkeys in federal penitentiaries, attendants at mental hospitals, social service workers in Y.W.C.A.'s, gas station attendants, fertilizer workers, smelting workers, watchmakers, workers in plumbing supplies manufacturing, and secretaries and clerks in government offices. (2) As a result of the admission to membership of groups not connected with the shipbuilding, etc., industry, the National vigorously opposed legislation then *Page 517 
pending in Congress to increase government subsidies for shipbuilding, contrary to the interest of the Local.
The dissatisfaction culminated in a meeting of the Local, held on July 30, 1948, as the result of the president having received petitions signed by 1029 members of a total membership of 3200 members. This meeting was called to discuss and act upon a proposal to disaffiliate the Local from the National. At the meeting on July 30, 1948, at which at least 2000 members were present, after what was patently a heated and acrimonious debate, a motion was made, seconded and carried without opposition referring the entire question of such disaffiliation to the Official Board of the Local. Thereafter, and until September 22, 1948 the Official Board made reports at each regular meeting to the general membership.
In accordance with the action taken at a regular membership meeting held on September 16, 1948, a special meeting of the membership was called for September 28, 1948. The notice of said meeting, signed "Official Board, I.U.M.S.W.A.-Local No. 1," reads as follows:
"This meeting is called for the purpose of acting upon the report and recommendations of the Local 1 Budget Committee, which was made at the last General Membership Meeting. A proposed budget for the six month period ending February 28, 1949 has been submitted as well as specific recommendations for the Local's financial operation during that period. It is essential that every member be present at this important meeting."
Thereafter, notice of this meeting was given in accordance with article 3, section 12 of the by-laws of the Local.
On September 24, 1948 the Official Board decided that a further report concerning these matters should be made to the general membership meeting called for September 28, 1948. Consistent therewith, the following notices were posted and served in accordance with the provisions of said by-laws:
"I.U.M.S.W.A.-Local No. 1
SPECIAL NOTICE
The following items of business are to be included on the agenda of the Special General Membership Meeting of Tuesday, September 28th:
1. Discussion and action upon a complete report and recommendations of the Negotiating Committee regarding a proposal for Sickness Insurance arrangement for Local 1 members. *Page 518 
2. Discussion and action upon a report by the Official Board regarding current problems of the Local.
NOTE: The above items are in addition to the item concerning the Budget Committee report to the membership.
ALL MEMBERS SHOULD BE PRESENT.
 Fraternally, OFFICIAL BOARD I.U.M.S.W.A.-Local No. 1."
At the meeting of September 28, 1948, at which "substantially more than 700 members attended," the following resolution was adopted:
"WHEREAS, the National Organization of the Industrial Union of Marine and Shipbuilding Workers of America has violated the cardinal principles of its constitution, particularly the principle of `One Industry-One Union,' and has in other ways violated its constitution which is its contract with this Local:
NOW, THEREFORE BE IT RESOLVED, that this Local does hereby terminate its affiliations with the said National Organization of the Industrial Union of Marine and Shipbuilding Workers of America and that such disaffiliation be effective as of this date, September 28, 1948, and;
BE IT FURTHER RESOLVED, that the Officers of this Local constituting the Official Board of this Local be and they hereby are authorized and directed to take such actions and do all things necessary or appropriate to render immediately effective the aforesaid disaffiliation, and to continue the operation of this Local for the benefit of its members in accordance with its By-Laws as the same are being forthwith amended to conform to the disaffiliated status of this Local under this resolution."
On vote by show of hands the motion was adopted by all of the membership then present and voting, with the exception of less than 25 members, who did not vote, and eight members who voted in the negative. The plaintiffs, William H. Harker, Howard G. Wintling and Harry J. Dunn, were present at this meeting.
Plaintiffs now contend that the action taken by the membership attending was illegal in that (1) under the common law contractual rights of the members of the Local, as established by the by-laws of the Local and the constitution of the National, without the affirmative consent of the National and over the opposition of any one member of the Local, the balance of the members of the Local were powerless to disaffiliate. *Page 519 
Their action in the attempted disassociation succeeded only in severing their connection with the Local. As a result, those members who continue to recognize the affiliation with the National continue to be the Local and succeed to all the rights and property of the Local, and (2) that in any event the action taken was not in accordance and in compliance with the terms of the by-laws of the Local. It is to be noted that the National is not a party to these proceedings and seeks no relief in this litigation.
The primary question here is, who is entitled to the assets of the Local? It is a question purely of property rights.
The only theory upon which plaintiffs can succeed under their first advanced theory is that a disaffiliation, as here, is violative of the contractual rights of the members of the Local, which arise as a result of the by-laws of the Local and the constitution of the National.
The by-laws of an unincorporated association must admittedly be regarded as a contract between the members thereof, upon which each member can rely. Height v. Democratic Women's Luncheon, c.,Inc., 131 N.J. Eq. 450, 25 Atl. (2d) 899.
Plaintiffs refer to a number of cases to sustain their contention that the arrangement among the members of the Local contemplated an irrevocable contract to continue affiliation with the National. A cursory examination of the cited authorities would lead to a conclusion that there is some confusion as to the power or authority of any portion of an unincorporated local association or society to successfully sever its connection with a national organization and thereafter to continue to be recognized as the original local association or society, with title to the assets of such local vested in them. A more thorough examination makes apparent the distinctions upon which the determinations were predicated.
There are generally three categories of cases where the questions now propounded have been considered, and where the results have been different. These are instances where (1) the association was a religious society, (2) the association was a dependent local association which, with other *Page 520 
locals, belonged to a national organization, generally a so-called "mutual benefit" association, or (3) the association was an independent local association which, with other locals, belonged to a national association.
 I
The cases involving religious societies are predicated either upon ecclesiastical law or the statutes there involved. Very clearly in those cases, the mother church was considered supreme, and the various individual local churches dependent and not independent organizations. The courts have held that although there is no doubt about the right of individual members to secede, no member or group of members, no matter how great the majority may be, however, has the right to secede from the mother church and take the property of the local church with it to a new affiliation, so long as there remains a faction of the local church which abides by the doctrines, principles and rules of the mother church government which the local body originally professed to recognize. The local churches were considered inferior to the general organization or denomination and deemed to hold the title to property in trust for the general organization or denomination.
In Schilstra v. Van Den Heuvel, 82 N.J. Eq. 155,90 Atl. 1056, the court said, at page 166:
"The rules of law relating to freedom of action by independent churches and congregations are different from those rules which apply to congregations which are affiliated with and are subordinate to higher judicatories. Independent churches may do what they please with their property, provided local action is taken to that end, but when a religious society becomes affiliated with other religious societies and they unite to construct and maintain for their mutual advantage higher judicatories to which they subject themselves, then the individual society or worshiping unit holds its property and temporalities under an obligation to continue the affiliation until it can be broken by mutual consent; and if secession is attempted by a faction, however large or however small, such faction will not be allowed to carry the church property with it, certainly not so long as there is a loyal body which is recognized by the superior judicatory."
See also Karoly v. Hungarian Reformed Church, 83 N.J. Eq. 514,91 Atl. 808; Grupe v. Rudisill, 101 N.J. Eq. 145, *Page 521 136 Atl. 911; Kelly v. McIntire, 123 N.J. Eq. 351,197 Atl. 736; True Reformed Dutch Church v. Iserman, 64 N.J. Law 506,45 Atl. 771.
It is plain that these cases are predicated, in the absence of statute, upon the theory that the local associations or societies have subjected themselves to "higher judicatories," in effect, that they are subservient to the general association of individual churches and have no right of independent action, resulting in a secession. Such is not the situation in the casesub judice. Here the Local was in existence prior to the organization of the National, which National came into being as a result of the efforts of the Local. Nowhere in the constitution of the National or the by-laws of the Local does there appear any relinquishment of the right of the Local to govern itself. The various locals comprising the National are here independent, forming a confederation which is not a higher judicatory.
In Shafran v. St. Nicholas, c., N.J., 117 N.J. Eq. 54,175 Atl. 139, the Court of Errors and Appeals unanimously affirmed the opinion of the court below, which opinion, in part, reads as follows:
"In support of the relief which complainants seek they insist that the society is a religious society, and that a portion of a religious society may not disfranchise the rest, nor can even a majority arbitrarily withdraw from a minority and appropriate to themselves the corporate name and property of the organization, citing in support of their contention Grupe v. Rudisill,101 N.J. Eq. 145; True Reformed Dutch Church of Paramus v.Iserman, 64 N.J. Law 506, and others. This is not a religious society and the cases cited have no application."
Since we are not now concerned with a statutory interpretation, those cases involving particular statutes will not be analyzed.
The cases of dependent religious societies are not in point and have no application, as was stated in International Union, c.,C.I.O. v. Recherer, 142 N.J. Eq. 561; 61 Atl. (2d) 16. *Page 522 
 II
It is conceded that where a local is a dependent member of a national, that there is no power of secession without consent of the national and, under certain circumstances, a unanimous consent of the membership of the local. In the cases involving dependent locals, it is clear that all the individual members of the respective locals forming the national have an interest in the funds and property of all of the other locals and that the property of a particular local is deemed held in trust not only for its own membership but for the other individual members of the balance of the locals as well. The funds and property are held in trust under the constitution of the superior organization. In such event, the decisions turn upon a determination that the national is composed of indivisible component parts, i.e., the locals, and that the latter are dependent for their existence upon a continuation of affiliation with the parent body. A dismemberment of one local does not cause the death of the national, but rather the death of the local. A secession of a part succeeds only in terminating the interest of the secessionists and if less than the entire number of members of the local, title to the assets of the local continue vested in the loyal members regardless of how small a percentage of the membership they may be. This situation usually occurs with so-called "mutual benefit" societies. The logic of the reasoning in such circumstances, in view of their by-laws and constitutions and their avowed purposes, is self-evident. Where the locals are independent, the right to secede exists.
The cases cited by the plaintiffs, i.e., Altmann v. Benz,27 N.J. Eq. 331; State Council c., v. Sharp, 38 N.J. Eq. 24;Knights of Pythias v. Germania Lodge, No. 50, 56 N.J. Eq. 63,38 Atl. 341, are not in point because there the dissentient members attempted a dissolution of the locally chartered chapter, or the local chapters were admittedly subordinate. We are not here concerned with any attempted dissolution. *Page 523 
 III
In considering the question of the independence of the locals, the courts have used various requisites as guides. Each case must depend upon its own particular facts and an analysis of the particular by-laws and constitutions.
A situation similar to that sub judice was presented in StateCouncil Jr. O.U.A.M. v. National Council, Jr. O.U.A.M.71 N.J. Eq. 433, 64 Atl. 561; affirmed, 79 N.J. Eq. 193,82 Atl. 47, where the court said at page 436:
"The complainant admits that for many years it has held a charter granted by the defendant, and that it acted in all respects in obedience to the laws enacted by the defendant until the fall of 1899, but it denies that it is in any sense the creature of the defendant, but asserts and shows that its existence as an organization of precisely its present character predated that of the defendant, and that it (the complainant), in conjunction with a similar organization in the State of Pennsylvania and one in the State of Delaware, created the defendant, and that the defendant owes its existence to the complainant rather than the contrary, and it argues that the subordinate position which, subsequent to the creation of the defendant, the complainant chose to occupy to it was purely voluntary and contractual, and that complainant had the right, at any time, at its free will and pleasure, to dissolve the same and resume its original independent existence with all its consequences, viz., the full and complete jurisdiction which it had previously exercised over numerous local councils of the same order in the State of New Jersey."
In State Council Jr. O.U.A.M. v. Enterprise Council, No. 6,75 N.J. Eq. 245, 72 Atl. 19, the Court of Errors and Appeals said at page 247:
"In that opinion he contrasted the legal relation between the national, state and subordinate councils with the legal relation between the national government and the governments of the several states. The decree in the first case was affirmed upon the vice-chancellor's opinion, and the appeal from the decree in the second case was dismissed. It is thus settled that it is the subordinate councils which have an independent existence, and that their relationship with the state and national councils is, as the vice-chancellor said, a purely voluntary one. The state council could have no greater right to coerce the subordinate council than the national council had to coerce the state council.
The fact that the national and state councils chose to call their permission to organize subordinate councils a `charter' and chose to call their constitution and by-laws `general laws,' does not give them *Page 524 
the force of law. As the vice-chancellor held in the opinion approved by this court, the relationship is purely contractual, and in ascertaining the terms of that contract, recourse must be had to the so-called `charter' and `laws,' which embodied the terms upon which individual members became associated in these organizations."
Parenthetically, it might be stated that the law of that case was held to apply to unincorporated associations as well as corporations. See State Council Jr. O.U.A.M. v. HollywoodCouncil, 75 N.J. Eq. 292, 72 Atl. 24.
In Schweitzer v. Schneider, 86 N.J. Eq. 88, 97 Atl. 159, affirmed on the opinion below, 86 N.J. Eq. 256, 98 Atl. 1086, the court said as follows, at page 92:
"In the case in hand, the United Garment Workers of America, which is not a party to these proceedings, was not the parent organization of the two local unions involved in this issue. The two local unions were formed prior to the organization of the United Garment Workers of America."
The adhesive element for the locals which compose the national is similar to that stated in National Council Jr. O.U.A.M. v.State Council Jr. O.U.A.M., 64 N.J. Eq. 470, 53 Atl. 1082, affirmed 66 N.J. Eq. 429, 57 Atl. 1132, where the court said as follows at page 474:
"The adhesive power which holds these several bodies together is the supposed benefit, first, to the individual members by reason of their membership; then to the subordinate council by reason of its connection with the state council, and then to the state council by reason of the benefit supposed to be derived by its connection with the national council."
It is to be noted that under the constitution of the National there is no provision made for individual members, as such, of the National. The National is not composed of individual members but is composed of affiliated locals. The sole provision for individual membership is to be found in article 4, section 2, paragraph B of the constitution of the National, where provision is made that
"In localities where there are not a sufficient number of workers employed in the enterprises and industries covered by the jurisdiction of the Union * * * any individual worker may affiliate directly with the National Union," *Page 525 
but when any employment is secured by him in a locality where a local union exists, he shall immediately transfer his membership to such local union. Legislative authority of the National is reserved to the membership in convention assembled, except that when the convention is not in session, executive and judicial powers are vested in the Executive Board. The convention consists in an assembly of the various locals represented by delegates and each local is entitled to a designated number of votes at the national convention by duly accredited delegates. The officers of the National are elected by these delegates of the various locals in convention assembled. No individual member of a local nor any member of the National disaffiliated with a local is granted any vote or voice in the election of officers or the conduct of the business of the National. It is plain, therefore, that the local could exist without the National but that the National, being composed of the locals, could not exist without them.
The plaintiffs argue that since there is no provision for disaffiliation or disassociation of the local, which they designate a subordinate body, such disaffiliation cannot be accomplished without the unanimous consent of all of the members thereof, and in addition, that the constitution of the National and the by-laws of the local constitute a contract and that a disaffiliation or disassociation would be a violation of the terms of such contract.
It is to be noted that although there is no express provision in either the by-laws of the local nor the constitution of the National for a voluntary disaffiliation by the local, there are provisions in the constitution of the National for the revocation of the so-called "charter" of the local by the National. That the prospect or possibility of such a voluntary disaffiliation was considered is to be found in article 4, section 22, which makes provision for the disposition of the property of the local "upon the dissolution, suspension, expulsion or termination ofaffiliation" with the union. Impliedly, at least, the right to disaffiliate is recognized.
Although the nature of the action in International Union, c.,C.I.O. v. Becherer, supra, was somewhat different from *Page 526 
the action here taken, the facts are closely parallel. In that case the plaintiff advanced a similar theory to that now being considered, but attempted to attain the same result, i.e.,
continued forced affiliation with a National, in a different manner. The plaintiffs now contend that the reasoning of the learned Vice-Chancellor there concerning the authority of any portion of an unincorporated local union to disaffiliate with a national union was dicta. It impresses the court that these pronouncements were not dicta but were necessary for the conclusion at which he arrived. In any event, the soundness of his reasoning is beyond dispute. The court there said as follows:
"I come now to the essential question. Has a local union the right, by the will of its membership, to withdraw from its affiliation with an international labor organization, and if it has, what is the effect upon its funds and property? I have examined the constitution of the International and find that it conforms to an old and well recognized pattern. It provides that any local group composed of 20 or more workers in the brewery,c., industry `can affiliate with the International Union' by applying for a local union charter and paying certain dues and assessments. It is true that under that constitution it is provided that a worker becoming a member of a local union becomes thereby also a member of the International, but the significant fact is that the International is a federation of local unions. Dues by the workmen are not paid directly or in the first instance to the International but are paid to the local union, which, in turn, remits out of these dues a per capita tax to the International. The relationship is closely analogous to that considered by the Court of Errors and Appeals in the case ofState Council, c., v. Enterprise Council No. 6,75 N.J. Eq. 245. That case involved the relationship between a national council, a state council and subordinate councils composed of individual members. These councils constituted a beneficial order, but the individual members paid their dues to their subordinate councils. There, as here, the relationship between the individual members and their immediate organization (the subordinate council) constitutes the very life of the entire structure. The existence of the Local Union, its revenue and its functions, are not derived from or dependent upon the International. These individual unions could well continue their existence and their functions without any relationship with any national or international labor organization. Such relationship may have its decided advantages but it is not a sina qua non. On the contrary, the international union does not depend for its continued existence upon affiliation with the local unions and upon receiving from the latter dues of per capita tax, or by whatever other name that revenue be called. Each local union is a separate and distinct voluntary association which owes its creation *Page 527 
and continued existence to the will of its own members. The property accumulated by the local union from contributions made by the individual members is a trust fund for the benefit of those members, and though the legal title to such property may be vested in the officers of the local, such ownership is of a trust character for the use of the individual members. The affiliation with the international union undoubtedly creates the liability resting on the local union to pay, while such affiliation endures, the dues or per capita tax called for in the international charter, but that gives the international union nothing more than a claim or an account receivable. No direct property right in the local union's assets can or does arise in favor of the international. The relationship between the international and its constituent local unions is that the local unions are the constituent units in a confederation comprising the international. That confederation is a voluntary one and any local union is free to withdraw from the alliance."
The facts recited by the learned Vice-Chancellor in the above quotation are almost identical with the facts sub judice. His logic is as applicable here as in the matter which he had under consideration. Therefore, it is not necessary to further reiterate the facts or conclusions here. Suffice it to say that the cited portion of the opinion, both factually and legally, is here adopted.
The local union obtained title to the real estate and personalty which is now the subject of this litigation by the contributions of its component members. This was in no way obtained as a result of any contribution by the National. The title, whether in the name of the local or held in trust for the benefit of the local, was for the benefit of the members of the local, an unincorporated association. The National existed and functioned only through representatives of its numerous locals and obtained its finances through a contribution made by said locals resulting from the payment of dues by the individual members of the locals to them. The affiliation with the National was not such a basic requirement as to make it impossible to accomplish a disaffiliation. Actually, as above pointed out, the local could and did exist prior to the organization of the National and could again exist without an affiliation with the National.
The by-laws of the local do not impose any contract between the members requiring an irrevocable subservience to *Page 528 
the National. The National is the result of a voluntary confederation of independent locals rather than the result of a parent superior "state" composed of dependent servient local "principalities."
It is here held, therefore, that under the circumstances present in the case sub judice, as shown by the affidavits and exhibits, there is nothing in the constitution of the National or the by-laws of the local which would beyond argument or doubt prevent the membership from disaffiliation, provided that adequate regard was had for the by-laws of the local.
It is necessary to ascertain whether there was a compliance with the by-laws of the local as to attain the objective of severance. In that connection, it is to be noted that the original call of the meeting for September 28, 1948 was made in accordance with the terms of the by-laws. The plaintiffs except to the meeting on the theory that (1) it was not called in accordance with article 1, section 5, (2) the notice thereof was not given in accordance with the provisions of said section, and (3) various references to the National in the by-laws of the local prevent the action of which complaint is here made. The by-laws of the local provide in part as follows, article 1, section 5:
"Sec. 5. Special Meetings: Special meetings shall be called by the President upon a written request of one hundred (100) members in good standing, by a motion passed at a General Membership meeting, or by the Executive Board. Should the President refuse to call a special meeting upon written request of 100 members, any elected officer of the Local may do so. At a special meeting no money shall be expended or authorized to be spent for any purposes, other than that stated in the call of the meeting. The notice of a special meeting shall contain a statement of the purpose of the meeting and shall be posted on all Union bulletin boards and in Union offices, and similar notification shall be given to each department secretary at least forty-eight (48) hours before the time of the meeting."
The first two of the reasons advanced are governed by Heightv. Democratic Women's Luncheon, c., Inc., supra, where the court said:
"Few members of an association attend all meetings. They may properly assume that if any action is contemplated which is of an *Page 529 
extraordinary nature and of great importance to the association, they will be notified that the matter will be brought up at the meeting. Without such notice, members who are absent from the meeting are not bound by the action of those who attend. Bagleyv. Reno Oil Co. (Pa.), 50 Atl. Rep. 760; Johnson v.Tribune-Herald Co., (Ga.), 116 S.E. Rep. 810; Des MoinesLife, c., Co. v. Midland Insurance Co., 6 Fed. Rep. (2d)
228."
It is important to ascertain whether there was a necessary compliance with the requirements for calling this meeting. The original call of the special meeting was upon the direction of a motion passed at the general membership meeting held on September 16, 1948. The meeting was properly called. The purpose of this meeting, as expressed in the first notice, was not originally the consideration of the question of disaffiliation. Thereafter, this additional purpose was deemed necessary to be considered by the Official Board. A new notice was given advising that an additional purpose was "discussion and action upon a report by the Official Board regarding current problems of the Local."
The special meeting set for September 28, 1948, as originally called, was authorized at a regular membership meeting, which is in accord with the by-law provisions. The sole objections to the meeting that are now urged are the inclusion of the additional purpose for consideration at this meeting after the service of the first notice setting forth a purpose, or that the resolution authorizing the special meeting expressed a limited purpose which did not include a consideration of disaffiliation. There is nothing in the affidavits filed that discloses the purpose of the special meeting authorized at the general meeting of September 16, 1948. It would appear that such meeting was a special meeting without set purpose. This being so, it would be tantamount to a general meeting specially held, and the session was entitled to consider any matter that might be designated to come before it, and of which notice had been given.
The purpose as expressed in the second notice would seem to have apprised the membership of what was intended to be deliberated upon. The only matter which was a "current problem" which the Official Board had had referred to it, as *Page 530 
appears from the pleadings, was the question of disaffiliation. In any event, even if more than one problem had been so referred, the question of disaffiliation was included and the members were informed of the prospect of making a report and being prepared for action thereon. The reason underlying the necessity of including a statement of the purpose of a special meeting in a notice is that no member be misled or unadvised and so be unable to express himself and vote. The subject of disassociation had been a subject for controversy and debate for some months. It was of utmost and paramount interest to all of the members. It cannot be said that any member was unadvised, ignorant of the purpose of the assemblage, or deceived as to its nature by the notice. Singularly, neither have the individual plaintiffs sworn that any of them was misled or unadvised of the purpose to consider disaffiliation, nor has any other member sworn that his failure to attend the meeting was occasioned by an alleged faulty notice. Actually, the individual plaintiffs were present at the meeting of September 28, 1948. The notice was sufficient compliance with the by-laws and served to inform the membership of the impending matter to be considered.
That there is no question of the interest and accord of the membership is exemplified by the subsequent written approval of the questioned action by approximately 90.04 per cent of the total membership.
Plaintiffs attempt to read into the various references in the by-laws of the local to the National that an irrevocable contract has been entered which prevents the local from ever disaffiliating or disassociating with the National.
The argument that the references in the by-laws of the local to the National demonstrates an intent for a permanent affiliation, does not make such a purpose clear. By amendment of the by-laws, as therein provided, these references could be changed. The provision in the application for membership in the local that the applicant will abide by the constitution of the National applies only so long as there is an affiliation and the by-laws remain unchanged. Such a statement *Page 531 
need not be read to require continued affiliation, but would seem to require only loyalty so long as loyalty was due.
Article III, section 3 of the constitution of the National requiring approval by it of the by-laws of the Local does not preclude the Local from severing its connections with the National. If the Local is independent it is plain that it could disaffiliate regardless of such a provision. If it is dependent, it could not. Using this phrase as a guide to aid in interpreting the contract does not result in a clear conclusion that the theory advanced by plaintiffs is thereby proven.
From the facts as exhibited by the affidavits, there is no such clear showing as would warrant the issuance of an interlocutory injunction. Plaintiffs have not shown that the portions of the by-laws applicable to the call and notice of a special meeting were violated.
As stated in Citizens Coach Co. v. Camden Horse Railroad Co.,29 N.J. Eq. 299:
"There is no power, the exercise of which requires greater caution, deliberation and sound discretion, and which is more dangerous in a doubtful case, than the issuing of an injunction."
In Allman v. United Brotherhood of Carpenters, c.,79 N.J. Eq. 150, 81 Atl. 116, the court said:
"It is perfectly well settled that whenever the complainant's case is doubtful on the law or the facts a preliminary injunction will not issue. To doubt is to deny. To justify the issuing of an interlocutory injunction the case made by the complainant must exhibit a right free from doubt or reasonable dispute. Robert v.Scull, 58 N.J. Eq. (13 Dick.) 396."
The plaintiffs' case, not being so clear of doubt on either the law or the facts, an interlocutory injunction will not be granted and the preliminary restraint will be dissolved. *Page 532